**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Select Hospitality, LLC, on behalf of itself and all others similarly situated. ) ) ) | |
| Plaintiff, ) ) | C.A. No. |
| v. ) ) | |
| Strathmore Insurance Company, ) ) | |
| Defendant. ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Select Hospitality, LLC, by and through its undersigned counsel, as and for its complaint against Defendant Strathmore Insurance Company ("Strathmore"), alleges as follows:

## INTRODUCTION

1.      This is a class action brought by Plaintiff on behalf of itself and all other persons or entities who own an interest in a business or restaurant that serves food and beverages on the premises and were insured by Strathmore between March 2020 and the present, with an insurance policy that does not contain an express virus exclusion, and that suffered a loss of business income (or other losses or expense related to business interruption) related to COVID-19 and/or state and local civil authority orders.

2.      This is an action for damages and a declaratory judgment arising out of Plaintiff's insurance coverage claims under its "all risks" insurance policies sold and insured by Strathmore.

3.      In order to protect its business and the income derived from its restaurant, Plaintiff purchased a property insurance policy from Strathmore that included business interruption insurance coverage and civil authority coverage.

4.      In March 2020, the COVID-19 pandemic spread throughout the United States and caused Plaintiff and all other restaurant businesses to close their doors as a result of the direct physical loss of or damage to the property caused by COVID-19 and the dangerous conditions relating to that damage, and as a result of various civil authority orders entered by state and local authorities. Plaintiff and all other restaurant businesses were forced to suspend their business operations due to their inability to use their property for their intended purposes due to COVID-19 and the civil authority orders entered by state and local authorities.

5.      Plaintiff and members of the Classes (defined below) have business interruption insurance coverage and/or civil authority coverage under their policies with Strathmore.

6.      The Strathmore policy expressly provides coverage for loss of "Business Income" and "Extra Expense" and the consequences of actions by "Civil Authority." Because of this express coverage, Plaintiff and the Classes believed their policies, which they had paid significant premiums for, would protect their businesses from the unlikely event that a pandemic would render Plaintiff and the Classes unable to use their properties for their intended purpose or that state and local governments would issue orders to stop or substantially restrict their operations in connection with a pandemic or any other Covered Cause of Loss.

7.      Contrary to the coverage provisions in their insurance policies with Strathmore, Strathmore has universally denied coverage to Plaintiff and members of the Classes and have refused to honor the contractual obligations Strathmore had under the policies.

8.      Strathmore's denials were part of an intentional strategy by Strathmore to deny all claims related to the civil authority orders entered by state and local governments and COVID-19. Strathmore's denial of coverage was disconnected from the facts of the claims, which Strathmore purposely did not reasonably investigate, and/or the specific coverage provided by the policies.

2

9. Plaintiff and the members of the Classes were subject to the same conduct by Strathmore.

10. Strathmore's denial of coverage to Plaintiff and the Classes caused them substantial financial losses. As a result of Strathmore's conduct, as alleged herein, Plaintiff and members of the Classes suffered substantial damages and, without appropriate declaratory relief, will continued to be harmed by Strathmore's misconduct.

## THE PARTIES

11. Plaintiff Select Hospitality is a Massachusetts limited liability company with its principal place of business at 314 Newbury Street in Boston, where it operates the Grand Tour restaurant.

12. Strathmore is incorporated under the laws of New York with a principal place of business at 200 Madison Avenue, New York, New York. Strathmore has conducted business in and issued insurance policies in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action that seeks certification of Classes of persons and entities; the Classes consist of more than one hundred proposed class members; the citizenship of at least one class member is different from Strathmore's citizenship; and the aggregate amount in controversy of the claims of Plaintiff and the Classes exceeds $5,000,000, exclusive of interest and costs.

14. This Court has personal jurisdiction over Strathmore because many of the actions giving rise to the claims at issue took place in this District and Strathmore regularly conducts business in this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391, because Plaintiff's principal place of business is in this District and a substantial portion of the events and omissions giving rise to the claims and losses occurred within this District.

## FACTUAL BACKGROUND

16.     Select Hospitality operates the Grand Tour restaurant at 314 Newbury Street in Boston, Massachusetts. The Grand Tour restaurant is a Parisian style bistro offering French-inspired cuisine that includes chacuterie and cheese plates, fresh vegetables, and dishes that include, among other things, Steak Tartare, Ocean Trout Crudo, Mussels, Rabbit, Duck and Venison, and a carefully curated American and French wine list.

17.     To protect its business in the event of property loss and business interruption, Plaintiff purchased a commercial property insurance policy from Strathmore. Exhibit 1hereto.

18.     The Plaintiff's policy with Strathmore insures against all risks of loss of or damage to property and ensuing business interruption and extra expense, unless specifically excluded or limited in the policy.

19.     Plaintiff has suffered direct physical loss of or damage to its property, loss of income, and extra expenses, caused by COVID-19 and by the Civil Authority Orders issued in Massachusetts. Likewise, property within one mile of Plaintiff's insured location has suffered direct physical loss of or damage to property caused by COVID-19.

## The Spread of COVID-19

20.     During the term of the policies, the novel coronavirus, SARS-CoV-2, commonly referred to as COVID-19, swept the entire globe. In or around November or December 2019, the

first cases of the virus spreading to humans were discovered. On February 1, 2020, the City of Boston announced its first confirmed case of COVID-19.[1]

21.     One of the first "super-spreading events" of COVID-19 in the United States originated in Boston during a medical conference during the last week of February, 2020, that was sponsored by Biogen at the Marriott Long Wharf hotel. The Biogen conference has been linked to at least 100 confirmed cases of COVID-19.[2]

22.     As of this filing, over 135,000 Americans have died from COVID-19, according to the Center for Disease Control and Prevention (CDC).[3] According to the CDC, as of July 14, 2020, Massachusetts has over 110,000 reported COVID-19 cases and over 8,000 deaths.[4]

23.     The scientific community has stated that COVID-19 can be transmitted in several different ways. In a "Situation Report" released by the World Health Organization ("WHO") in April 2020, it reported that **the virus can be transmitted**, among other ways, "through respiratory droplets, by direct contact with infected persons, or **by contact with contaminated objects and surfaces**."[5]

---

[1] https://www.boston.gov/departments/public-health-commission/coronavirus-timeline (last visited June 8, 2020).

[2] https://www.nytimes.com/2020/04/12/us/coronavirus-biogen-boston-superspreader.html (last visited July 7, 2020); https://www.bostonherald.com/2020/05/02/biogen-conference-in-boston-recognized-by-top-cdc-official-as-major-coronavirus-event/ (last visited July 7, 2020).

[3] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 15, 2020).

[4] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 15, 2020).

[5]     https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last visited June 8, 2020) (emphasis added); *see also https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics* (last visited June 8, 2020) ("**Coronavirus can also spread from contact with infected surfaces or objects. For example, a person can get COVID-19 by touching a surface or object that has the virus on it** and then touching their own mouth, nose, or possibly their eyes.") (emphasis added).

24.     The WHO has stated the following in explaining how the virus spreads: "The disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks. These droplets are relatively heavy, do not travel far and quickly sink to the ground. People can catch COVID-19 if they breathe in these droplets from a person infected with the virus.  This is why it is important to stay at least 1 meter) away from others. **These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth.**  This is why it is important to wash your hands regularly with soap and water or clean with alcohol-based hand rub."[6]

25.     The time between exposure to the virus and the showing of symptoms is generally between one and fourteen days, with five to six days being a common period of time for an individual to begin showing symptoms.[7]

26.     According to a study in the New England Journal of Medicine ("NEJM"), **COVID-19 was detectable** in aerosols for up to three hours, up to four hours on copper, **up to twenty-four hours on cardboard, for three to six days on plastic and stainless steel, up to three days for glass, and on wood and cloth for up to twenty-four hours.**[8] The NEJM study indicates that individuals can become infected with COVID-19 through indirect contact with surfaces or objects, including copper, plastic, cardboard, glass and stainless steel.

---

[6]     https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited June 8, 2020) (emphasis added).

[7] *See, e.g.,* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses (last visited June 8, 2020); https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited June 8, 2020).

[8] https://www.nejm.org/doi/pdf/10.1056/NEJMc2004973 (last visited June 8, 2020) (emphasis added).

27.     Other scientific studies have documented that other strains of human coronaviruses, such as SARS and MERS, can survive on surfaces such as metal, glass or plastic for up to nine days and other surfaces such as wood and silicon rubber for four to five days.[9]

28.     Plaintiff and members of the Classes use many of these materials, including plastic, glass, cardboard, silicone rubber and stainless steel, in connection with their food preparation and service.

29.     These studies and others confirm that a person's contact with such contaminated surfaces can lead to transmission of the COVID-19 virus.

30.     Recent scientific commentary has stated that COVID-19 can be transmitted through the air via airborne microdroplets, and the "problem is especially acute in indoor or enclosed environments, particularly in indoor or enclosed environments, particularly those that are crowded and have inadequate ventilation . . . relative to the number of occupants and extended exposure periods".  The scientific commentary describes how the COVID-19 virus can travel in microscopic droplets in the air that are then inhaled by others and thereby infect those individuals with the virus. These concerns of airborne transmission of COVID-19 are expressed in a recent commentary signed by over 230 scientists addressed to the WHO.[10] In response to this commentary, on July 7, 2020, the WHO recognized that there is "emerging evidence" that COVID-19 can be spread through airborne transmission.[11]

---

[9] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7132493/pdf/main.pdf (last visited June 8, 2020).

[10] A copy of the scientific commentary is available at
https://academic.oup.com/cid/article/doi/10.1093/cid/ciaa939/5867798 (last visited July 7, 2020).

[11] https://www.nbcnews.com/health/health-news/who-acknowledges-emerging-evidence-airborne-spread-covid-19-n1233077 (last visited July 7, 2020).

31.     News outlets have noted that the airborne transmission of COVID-19 across a room has been demonstrated in indoor environments including in restaurants.[12] As the New York Times recently reported, "the risk [of airborne transmission] is highest in crowded indoor spaces with poor ventilation, and may help explain super-spreading events reported in meatpacking plants, churches and restaurants."[13]

## Entry of Civil Authority Orders

32.     In efforts to slow the spread of COVID-19, state and local governments across the country, including in Massachusetts, imposed orders requiring residents to "socially distance" and remain at home unless they are performing "essential" activities, like going to a grocery store for food, picking up a prescription at a pharmacy, going to a medical appointment, or going outside for a walk or exercise.

33.     On March 10, 2020, Governor Charlie Baker declared a state of emergency in the Commonwealth of Massachusetts relating to COVID-19.[14]

34.     On March 15, 2020, Governor Baker issued an order providing that "Any restaurant, bar, or establishment that offers food or drink shall not permit on-premises consumption of food or drink; provided that such establishments may continue to offer food for take-out and by delivery provided that they follow the social distancing protocol set forth in Department of Public Health

---

[12] https://www.npr.org/sections/goatsandsoda/2020/07/06/887919633/aerosols-droplets-fomites-what-we-know-about-transmission-of-covid-19 (last visited July 7, 2020).

[13] https://www.nytimes.com/2020/07/06/health/coronavirus-airborne-aerosols.html (last visited July 7, 2020).

[14] https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19 (last visited June 8, 2020).

guidance."[15] When this order was issued, COVID-19 cases had been confirmed in 10 of the 14 counties in Massachusetts, including in Suffolk County.

35.     On March 15, 2020, the City of Boston issued a public health emergency relating to the COVID-19 pandemic.[16]

36.     On March 23, 2020, Governor Baker issued another order limiting restaurants, bars and other retail establishments that sell food and beverage products to offer food and beverage for take-out and delivery only and expressly provided: "Restaurants, bars and other retail establishments that offer food and beverages to the public shall not permit on-premises consumption of food and beverage."  The order further provided that gatherings of 10 or more people "are prohibited throughout the Commonwealth."[17]   In his order, Governor Baker recognized that there had been confirmed cases of COVID-19 in virtually every county in Massachusetts.

37.     On March 31, 2020, Governor Baker extended the restrictions in his March 23 order, including with respect to restaurant operations and prohibiting the gathering of 10 or more people, until at least May 4, 2020.[18]

38.     On April 27, 2020, the City of Boston extended the public health emergency related to the COVID-19 pandemic indefinitely until further notice.[19] As of this filing, the City of Boston

---

[15]    https://www.mass.gov/doc/march-15-2020-large-gatherings-25-and-restaurants-order/download   (last visited June 8, 2020).

[16]    https://content.boston.gov/news/public-health-emergency-declared-boston-due-coronavirus  (last visited June 8, 2020).

[17]    https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download (last visited June 8, 2020).

[18]    https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download (last visited June 8, 2020).

has not lifted its indefinite public health emergency status. In his April 27, 2020 order, Mayor Walsh recognized that "there is clear evidence that coronavirus disease 2019, also known as COVID-19, continues to cause serious harm to the public health of the City of Boston."

39.     On April 28, 2020, Governor Baker extended the restrictions in his March 31 order, including with respect to the restrictions on restaurant operations and prohibiting gatherings of 10 or more people, until at least May 18, 2020.[20]

40.     On May 15, 2020, Governor Baker extended the restrictions in his April 28, 2020 order, including with respect to the restrictions on restaurant operations and prohibiting gatherings of 10 or more people, until at least May 18, 2020.[21]

41.     On May 18, 2020, Governor Baker issued an Order Implementing a Phased Reopening of Workplaces and Imposing Workplace Safety Measures to Address Covid-19.[22] This order contained details regarding a Phase I, which did not permit any easing of the forgoing restrictions on restaurants, bars and other establishments that serve food and beverages on the premises.

---

[19]   https://www.boston.gov/sites/default/files/file/2020/04/PHE%20Declaration%20Extension.pdf   (last visited June 8, 2020).

[20]   https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download   (last visited June 8, 2020).

[21]   https://www.mass.gov/doc/may-15-2020-24-hour-extension-order/download (last visited June 8, 2020).

[22]   https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download (last visited June 8, 2020).

42. On May 18, 2020, Governor Baker released the *Reopening Massachusetts* plan, a report issued by the Commonwealth's Reopening Advisory Board, which set forth a four-stage plan for the reopening of businesses and activities within the Commonwealth.[23]

43. Under the *Reopening Massachusetts* plan, Governor Baker announced that the Commonwealth anticipated allowing restaurants to partially re-open for consumption of food and beverages on their premises under Phase II of the plant but that this would include severe restrictions on the precautions required to be taken by those businesses, a strict limit on a reduced number of customers allowed on the premises and restrictions on what parts of restaurants could be used for the service of food and beverages.[24]

44. On June 6, 2020, Governor Baker issued an order authorizing the re-opening of certain businesses and properties, effective June 8, 2020, under Phase II of the *Reopening Massachusetts* plan.[25] Under this order, Governor Baker restricted the opening of restaurants for service of food and beverages on the premises to only "outdoor table service" under Step 1 of the Phase II process. This limited restaurants to providing food or beverage on the premises to outdoor seating areas, subject to various limitations including social distancing and cleaning requirements, and continued to prohibit indoor dining at restaurants.

45. Governor Baker's June 6, 2020 order further provided that restaurants would be prohibited from providing indoor table service on their premises until Step 2 of Phase II, which

---

[23] https://www.mass.gov/news/reopening-massachusetts-baker-polito-administration-initiates-transition-to-first-phase-of and https://www.mass.gov/doc/reopening-massachusetts/download (last visited June 8, 2020);

[24] https://www.mass.gov/doc/reopening-massachusetts/download.

[25] https://www.mass.gov/doc/june-6-2020-phase-ii-reopening/download (last visited June 8, 2020).

would come through a subsequent "Phase II Order" … [i]f the public health data reflects continued positive progression."[26]

46.     On June 19, 2020, Governor Baker issued a Phase II Order authorizing Step 2 of Phase II to begin on June 22, 2020.[27]  This order allowed indoor dining service at restaurants in the Commonwealth to begin, although the indoor dining was still subject to various restrictions including adherence to social distancing protocols, the use of masks and gloves, cleaning and disinfecting procedures and various other rules.

47.     On July 2, 2020, Governor Baker announced that Step 1 of Phase III of the Reopening Massachusetts Plan would begin.[28] Phase III still severely limits indoor dining at restaurants and requires continued adherence to social distancing protocols, the use of masks and gloves, cleaning and disinfecting procedures and various other rules.

48.     The orders issued by Governor Baker were issued because of, among other things, the spread of COVID-19 and the transmission of the virus through human contact with affected property.

49.     Plaintiff's business, which is located in Massachusetts, has been subject to each of the forgoing civil authority orders.  These orders and the transmission of COVID-19 have had a devastating effect on Plaintiff's business.

50.     Under Governor Baker's orders, until June 22, 2020, Plaintiff has been prohibited from operate its dining room and has been restricted to carry out or delivery services, which is not its normal and primary form of providing food and beverages. Ever since Governor Baker's June

---

[26] https://www.mass.gov/doc/june-6-2020-phase-ii-reopening/download.

[27] https://www.mass.gov/doc/reopening-phase-2-step-2-order/download (last visited June 25, 2020).

[28]   https://www.mass.gov/news/reopening-massachusetts-baker-polito-administration-initiates-transition-to-third-phase-of (last visited July 6, 2020).

22, 2020 order, Plaintiff has been limited by that order and other orders with regard to the amount of indoor dining service that it has been allowed to provide to customers. As a result, Plaintiff and other restaurants have had to suspend their operations due to their inability to use their properties for their intended purposes due to COVID-19 and the civil authority orders entered.

51.     States across the country have taken efforts similar to Massachusetts and have implemented similar social distancing and stay at home orders in responses to hundreds of thousands of confirmed COVID-19 cases. State governments have required large scale business closures and imposed other limitations on customer and employee movement that have prevented restaurants from operating and causing widespread Business Income and Extra Expense losses.

52.     Since March, all state governments, with the exception of South Dakota, have enacted one or more civil authority orders prohibiting or severely restricting dine in service and other operations at restaurants.[29]

### The Policy

53.     Strathmore issued policy number 8120T24442, effective January 24, 2020 to January 24, 2021, to Select Hospitality with Select Hospitality, LLC as the named insured (the "Policy"). The policy provides business income and extra expense insurance coverage for its designated premises, subject to a blanket limit of $500,000. See Exhibit 1, Commercial Property Declarations

54.     The Policy is a form insurance policy issued by Strathmore.

55.     Specifically, the Policy covers, among other things:

   a.   The direct physical loss of or damage to Plaintiff's property;

---

[29]   https://www.kff.org/health-costs/issue-brief/state-data-and-policy-actions-to-address-coronavirus/   (last visited July 9, 2020).

b.   The actual loss of business income Plaintiff sustains due to the necessary suspension of their operations, where the suspension is caused by direct physical loss of or damage to Plaintiff's property;

c.   Plaintiff's extra expenses to avoid or minimize the suspension of its business;

d.   The actual loss of business income Plaintiff sustains and necessary extra expense caused by an action of civil authority that prohibits access to Plaintiff's property; and

e.   The actual loss of business income Plaintiff sustains due to the suspension of its operations, where the suspension is caused by direct physical loss or damage to property operated by others whom Plaintiff depends upon to (i) deliver materials and services, (ii) accept Plaintiff's products and services, (iii) manufacture Plaintiff's products for delivery to customers; and (iv) attract customers to Plaintiff's business.

56.   The Policy does not contain any exclusion for viruses even though Strathmore could have included such an exclusion in the Policy and chose not to do so.

57.   The Policy also does not contain a pandemic exclusion even though Strathmore could have included such an exclusion in the Policy and chose not to do so.

58.   The Business Income (and Extra Expense) Coverage Form which defines the "Business Income" and "Civil Authority" coverage and other forms in the Policy are standardized forms drafted by the Insurance Services Office ("ISO"). ISO is a company that drafts standard policy language for use in insurance contracts used by insurers around the country.

59.   In 2003, the Severe Acute Respiratory Syndrome (SARS) coronavirus epidemic affected 26 countries, infecting roughly 8,000 people. The SARS epidemic led to millions of dollars in business interruption insurance claims.[30]

---

[30] https://www.washingtonpost.com/business/2020/04/02/insurers-knew-damage-viral-pandemic-could-wreak-businesses-so-they-excluded-coverage/ (last visited July 7, 2020).

60.     In 2005 and 2006, the H5N1 avian flu pathogen began spreading worldwide. By June 2006, the WHO predicted an upsurge in human deaths due to H5N1 in the latter half of 2006 or early part of 2007.[31]

61.     As a result of SARS and avian flu epidemics, many insurers added exclusions to standard commercial policies for losses caused by viruses, bacteria, or other micro-organisms which cause disease.

62.     In November, 2006, the ISO drafted a form exclusion for losses "due to disease-causing agents such as viruses and bacteria."

63.     In presenting the exclusion to state insurance regulators around the country, ISO stated:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses. Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case.

64.     The insurance industry has thus recognized that the presence of virus or disease can constitute physical damage to property since at least 2006.

65.     Even though the Policy contains other ISO forms, Strathmore did not add ISO's virus exclusion endorsement to the Policy. Indeed, Strathmore could have used standard insurance industry forms or coverage provisions to specifically exclude losses relating to viruses like COVID-19 from coverage, but it did not do so.

---

[31] https://en.wikipedia.org/wiki/Global_spread_of_H5N1_in_2006 (last visited July 7, 2020).

**Impact of COIVD-19 and the Civil Authority Orders on the Restaurant Business**

66.     As COVID-19 has spread across the United States, collateral damage has been far and wide, with the restaurant industry sustaining one of the heaviest blows.

67.     Governor Baker's orders were issued because of, among other things, direct physical loss of or damage to property caused by or resulting from a Cause of Loss covered under the Policy.

68.     The orders have operated to prohibit access to Plaintiff's insured location as well as other places throughout the Commonwealth. Plaintiff and other restaurants have had to suspend their business operations due to their inability to use their properties for their intended purposes due to COVID-19 and the civil authority orders.

69.     The prohibition of access is a result of damage to property and the dangerous physical conditions resulting from that damage.

70.     Even where restaurants were permitted to continue delivery and take-out operations, the pandemic has had a significant impact on business volume and practices. By way of example, restaurants in the Commonwealth have been required to increase the frequency of cleaning, reduce hours, institute "no contact" food pickup procedures, provide personal protective equipment to employees, and prohibit customers from entering their premises until at least June 22, 2020, which only allowed limited numbers of patrons to do indoor dining, subject to stringent social distancing and other requirements.

71.     Plaintiff and the members of the Classes have had to suspend their business operations due to their inability to use their properties for their intended purposes due to COVID-19 and the civil authority orders entered by state and local authorities.

72.     According to the Massachusetts Restaurant Association, about 20% of the state's restaurants will not reopen after the coronavirus pandemic restrictions are lifted.[32]

**Plaintiff's Claim Under the Policy and Strathmore's Rejection of the Claim**

73.     COVID-19 and the resulting orders issued by Governor Baker have caused and continue to cause Plaintiff physical loss of or damage to property and business income losses.

74.     Select Hospitality submitted a claim with Strathmore on April 1, 2020. On April 13, 2020, Strathmore issued its denial of Select Hospitality's claim. Exhibit 2 hereto.

75.     In denying Select Hospitality's claim, Strathmore summarily concluded that Select Hospitality's losses "do[] not constitute physical loss of or damage to either covered property at the described premises or damage to any property in the surrounding area which would limit access to the insured location(s)."

76.     This is directly contrary to the Strathmore form policy which provides that Select Hospitality's inability to use its premise to operate its business as a result of the physical loss of or damage to the property caused by COVID-19 is sufficient to trigger the business income and related coverages.

77.     Strathmore denied Select Hospitality's claim without conducting any inspection or review of the Grand Tour property or documents concerning its business activities in 2020.

78.     Strathmore has therefore waived any right to inspect the premise, deny coverage for any reason related to conditions at the Grand Tour property, or raise any defense related to conditions at the property or facts specific to the Grand Tour property.

---

[32] https://boston.cbslocal.com/2020/06/23/coronavirus-pandemic-impact-long-term-closing-restaurants-retailers

79.     COVID-19 is a covered cause of loss under Select Hospitality's policy with Strathmore and no exclusion applies to Select Hospitality's claims, and therefore the Strathmore policy provides coverage for Select Hospitality's claims.

80.     On information and belief, Strathmore has a national policy and practice of denying, without investigation, all claims for business income and extra expense coverage and civil authority coverage, based upon the COVID-19 pandemic, including for policies which do not have a virus or pandemic exclusion.

81.     Strathmore's denial of claims without conducting an appropriate review of the properties, as well as how swiftly Strathmore denied Plaintiff's claim demonstrates that Strathmore did not engage in a good faith or reasonable investigation of the claims which would have included an assessment of facts or issues relevant to the Plaintiff's property.

82.     Strathmore's rejection of Select Hospitality's claim was part of a policy and practice by Strathmore to limit its losses due to the COVID-19 pandemic despite the fact that the Strathmore policy provided coverage for losses due to loss of use of property and from closure orders issued by civil authorities.

83.     The rejection letter to Plaintiff from Strathmore is a form denial letter which contained form grounds for denial of its claim without regard to the underlying facts of Plaintiff's claim.

84.     In denying Plaintiff's claim, Strathmore has failed to meet its obligations as set forth in the Policy, failed to conduct a meaningful investigation, and acted in bad faith in its rote and form denial of Plaintiff's claim under the Policy.

85.     Strathmore's conduct reflects that Strathmore accepted the premiums paid by the Plaintiff with no intention of providing business income losses, physical damage, civil authority or

other applicable coverage for claims like those submitted by Plaintiff that Strathmore denied out of hand.

86.     Upon information and belief, Strathmore has collected millions of dollars in premiums from the members of the Classes for policies that covered losses caused by the COVID-19 pandemic, but Strathmore has nevertheless systematically and uniformly engaged in a practice of denying claims brought by businesses, including restaurants like Plaintiff, which were required to close as a result of civil authority orders and COVID-19.

87.     Strathmore's denial of such claims was not limited to Plaintiff. On information and belief, including publicly available reports, Strathmore has engaged in the same misconduct, as alleged herein relating to Plaintiff, by summarily denying claims submitted by at least hundreds of other Strathmore insureds who have suffered losses related to the COVID-19 pandemic and civil authority orders.

88.     Plaintiff's claim and those of the proposed Classes arise from a single course of conduct engaged in by Strathmore through which it has uniformly refused to provide any coverage for business losses related to the COVID-19 pandemic and the related actions taken by civil authorities to suspend business operations.

89.     As a result of Strathmore's bad faith denial and unreasonable investigation, Plaintiff and the Classes have suffered and continue to suffer damages.

90.     In light of Strathmore's bad faith and automatic form denial of all COVID-19 related claims under its policies, submission of further claims by members of the Classes would be futile and therefore the members of the Classes should not be required to have submitted a claim under their policies with Strathmore in order to participate in this action as class members.

91.     In light of Strathmore's bad faith and automatic form denial of all COVID-19 related claims under its policies, Strathmore also has waived or is estopped from arguing that a claim must

be filed under the policies in order for an insured to file suit or participate in a suit with respect to coverage under the policies.

## **Class Action Allegations**

92.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4), Select Hospitality brings its claims on behalf of itself and a class ("the Nationwide Business Income and Extra Expense Coverage Class") of:

> All persons or entities in the United States (including its territories and the District of Columbia) who own an interest in a business that served food and beverages on the premises which had Business Income and/or Extra Expense coverage under a property insurance policy issued by Strathmore, which does not have an express virus or pandemic exclusion, that suffered a suspension of business operations due to their inability to use their property for their intended purposed due COVID-19.

93.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4), Select Hospitality brings its claims on behalf of itself and a class ("the Nationwide Civil Authority Coverage Class") of:

> All persons or entities in the United States (including its territories and the District of Columbia) who own an interest in a business that served food and beverages on the premises which had Civil Authority coverage under a property insurance policy issued by Strathmore, which does not contain an express virus or pandemic exclusion, that suffered loss of Business Income and/or Extra Expense caused by an action of a civil authority.

94.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4), Select Hospitality also brings its claims on behalf of itself and a subclass of ("the Massachusetts Business Income and Extra Expense Coverage Subclass"):

> All persons or entities in Massachusetts who own an interest in a business that served food and beverages on the premises which had Business Income and/or Extra Expense coverage under a property insurance policy issued by Strathmore, which does not have an express virus or pandemic exclusion, that suffered a suspension of business operations due to their inability to use their property for their intended purposed due COVID-19.

95.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4), Select Hospitality also brings its claims on behalf of itself and a subclass of ("the Massachusetts Civil Authority Coverage Subclass"):

> All persons or entities in Massachusetts who own an interest in a business that served food and beverages on the premises which had Civil Authority coverage under a property insurance policy issued by Strathmore, which does not contain an express virus or pandemic exclusion, that suffered loss of Business Income and/or Extra Expense caused by an action of a civil authority.

96.     The Nationwide Business Income and Extra Expense Coverage Class, the Nationwide Civil Authority Coverage Class, the Massachusetts Business Income and Extra Expense Coverage Subclass, and the Massachusetts Civil Authority Coverage Subclass are referred to herein collectively as the "Classes." The Massachusetts Business Income and Extra Expense Coverage Subclass and Massachusetts Civil Authority Coverage Subclass are referred to herein collectively as the "Massachusetts Subclasses."

97.     Excluded from the Classes are Strathmore, and its officers, subsidiaries and affiliates.

98.     Plaintiff reserves the right to revise the definitions of the Classes based upon information learned through discovery or as otherwise may be appropriate.

99.     The Classes are too numerous for joinder of all class members to be practicable. On information and belief, the Classes each consist of at least hundreds, if not thousands, of persons and entities. The precise number of members of the Classes can be ascertained from Strathmore's records. Class members may be notified of the pendency of this action by Court-approved notice disseminated by means such as U.S. mail, electronic mail, Internet postings, social media, and/or published notice.

100.     This action involves significant common questions of law and fact, including, but not limited to:

a. Whether the insurance policies issued by Strathmore to Plaintiff and the Classes are all-risk policies?

b. Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 required a suspension at businesses serving food and beverages on their premises?

c. Whether the actions of civil authorities taken in response to the presence or threat of COVID-19 prohibited access at businesses serving food and beverages on their premises?

d. Whether Strathmore's Business Income and Extra Expense coverage applies to a suspension of business caused by COVID-19 and/or related actions of civil authorities taken in response to the presence or threat of COVID-19;

e. Whether Strathmore's Civil Authority coverage applies to a loss of business income (and extra expense) caused by the orders of local, municipal, city, county, and/or state or national governmental entities requiring the suspension of business during the outbreak of COVID-19 in the United States;

f. Whether uniform, blanket denials by Strathmore of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 breached Strathmore's insurance contracts?

g. Whether uniform, blanket denials by Strathmore of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19 are unfair claims settlement practices and unfair or deceptive acts or practices?

h. Whether Plaintiff and the members of the Classes are entitled to a declaratory judgment that their uniform policies with Strathmore provide them with coverage

22

for their losses due to the COVID-19 pandemic and the civil authority actions related thereto?

101.     Select Hospitality's claims are typical of the claims of the members of the Classes whom it seeks to represent. Select Hospitality and all members of the Classes purchased insurance coverage from Strathmore that included coverage for business interruption and had their claims denied pursuant to Strathmore's conduct alleged herein. Select Hospitality's claims are based upon the same legal theories as the claims of the other members of the Classes.

102.     Select Hospitality will fairly and adequately represent and protect the interests of the Classes. Select Hospitality has retained counsel competent and experienced in complex class action litigation. Select Hospitality intends to prosecute this action vigorously. Neither Select Hospitality nor its counsel has interests that conflict with the interests of the other members of the Classes.

103.     Common questions of law and fact will predominate over any questions, if any, affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The damages or other financial detriment suffered by Select Hospitality and the members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Strathmore, so it would be impracticable for members of the Classes to individually seek redress for Strathmore's wrongful conduct.

104.     Even if Class members could afford to pursue individual litigation, the filing of thousands of individual actions relating to uniform policy provisions would create a potential for inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Strathmore.

105.     Thousands of individual actions also would increase the delay and expense to all parties as well as the Court. A class action would provide far fewer management difficulties and

provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

106.    Strathmore also has acted or refused to act on grounds generally applicable to Select Hospitality and the members of the Classes, thereby making final injunctive relief and declaratory relief, as described herein, with respect to the Classes as a whole appropriate.

## COUNT I – DECLARATORY JUDGMENT

### (On Behalf of Select Hospitality and the Classes)

107.    Plaintiff incorporate the forgoing allegations as if fully set forth herein.

108.    Select Hospitality seeks a declaration of the Court regarding Select Hospitality's and the members of the Classes' rights and duties under their form insurance policies with Strathmore.

109.    An actual controversy exists between Select Hospitality and the members of the Classes and Strathmore as to whether the Strathmore policies provide coverage for Select Hospitality's and the members of the Classes' claims.

110.    Select Hospitality seeks a declaration from the Court that: (i) the Strathmore policies cover Select Hospitality's and the members of the Classes' claim; and (ii) no exclusion under the Strathmore policies apply to bar or limit coverage for Select Hospitality's and the members of the Classes' claims.

111.    Select Hospitality seeks a declaration that Select Hospitality and the members of the Classes are entitled to Civil Authority coverage, that the civil authority orders alleged herein trigger such coverage because (a) they are orders of a civil authority, (b) the orders specifically prohibit access to the premises in question, including prohibiting potential on-premises dining and customers and workers from accessing the premises in question, (c) the prohibited access to the premises has been continuous and ongoing since the orders were issued, such that full access has not subsequently been permitted, (d) the orders prohibit access as a result of direct physical loss of or

damage to property, other than at the premises in question, caused by or resulting from a Covered Cause of Loss; (e) no coverage exclusions or limitations apply to exclude or limit coverage; and (f) Select Hospitality and the members of the Classes have suffered actual and covered losses of Business Income (and Extra Expense).

112.    Select Hospitality seeks a declaration that Select Hospitality's and the members of the Classes' Business Income coverage (and Extra Expense coverage) is triggered because (a) Select Hospitality and the Classes' members have sustained actual loss of Business Income (and Extra Expenses) due to the closure of their businesses, (b) said closure constitutes a necessary suspension of their operations under their insurance policies, (c) this suspension has been and is caused by direct physical loss of or physical damage to property at the premises in question, due to the presence of COVID-19, (d) the presence of COVID-19 is a Covered Cause of Loss, and (e) some or all of the periods of the Select Hospitality's and the Classes' closures are within the period of restoration under their insurance policies.

## COUNT II – BREACH OF CONTRACT

### (On Behalf of Select Hospitality and the Classes)

113.    Plaintiff incorporate the forgoing allegations as if fully set forth herein.

114.    The Strathmore insurance policies are valid and enforceable contracts between Select Hospitality and the members of the Classes, on the one hand, and Strathmore, on the other hand.

115.    At all times relevant herein, Select Hospitality has paid all premiums and performed all its obligations under its insurance policy with Strathmore.

116.    Under the insurance policies at issue, Strathmore owed Select Hospitality and the members of the Classes contractual duties to provide insurance coverage as provided in their policies.

117.     Under the Strathmore policies, Strathmore promised to pay for loss of Business Income (and Extra Expense) sustained as a result of a suspension of business operations. COVID-19 has caused and continues to cause direct physical loss of or damage to Select Hospitality's and the members of the Classes' properties and the properties of those upon whom Select Hospitality and the members of the Classes rely. As a result of the direct physical loss of or damage to property, Select Hospitality and the members of the Classes have experienced a slowdown or cessation of its business (i.e., a "suspension," as defined by the Strathmore policies). The resulting suspensions of business and losses triggered the Business Income (and Extra Expense) coverage under the Strathmore policies.

118.     Under the Strathmore policies, Strathmore also promised to pay for losses of Business Income (and Extra Expense) incurred as a result of certain actions taken by civil authorities that prohibit access to Select Hospitality's and the members of the Classes' premises. COVID-19-related direct physical loss of or damage to properties within a one mile radius of Select Hospitality's and the members of the Classes' premises caused civil authorities to prohibit access to Select Hospitality's and the members of the Classes' premises. Select Hospitality and the members of the Classes have experienced and continue to experience a loss of Business Income (and Extra Expense) under the civil authority coverage of the Policies arising from the direct physical loss of or damage to property caused by COVID-19 and the resulting civil authority orders. These actions, losses, and expenses triggered civil authority coverage under the Strathmore policies.

119.     As alleged herein, Strathmore has breached its duties under the insurance policies, including through its blanket denial of claims under the policies.

120.     As a result of Strathmore's breaches, Select Hospitality and the members of the Classes have been damaged in the amount of coverage to which they are entitled under their

insurance policies, the premiums they paid, and other amounts to be proven at trial. Select Hospitality seeks compensatory damages with interest for itself and the members of the Classes.

121.     Select Hospitality and the members of the Classes have attempted to mitigate their business income losses but have been unable to do so.

## COUNT III – VIOLATION OF G.L. c. 93A, §§ 2, 11

### (On Behalf of Select Hospitality and the Massachusetts Subclasses)

122.     Plaintiff incorporate the forgoing allegations as if fully set forth herein.

123.     Strathmore is engaged in trade or commerce in the Commonwealth of Massachusetts.

124.     Select Hospitality and the members of the Massachusetts Subclasses are engaged in trade or commerce in the Commonwealth of Massachusetts.

125.     Strathmore's conduct as alleged herein constitutes unfair claim settlement practices in violation of G.L. c. 176D, §3(9).  Among other things, Strathmore has refused to pay the claims of Select Hospitality and members of the Massachusetts Subclasses without conducting a reasonable investigation based upon all the information available, and Strathmore has failed to effectuate prompt, fair and equitable settlements of Select Hospitality's and the Massachusetts Subclasses' claims in which liability has become reasonably clear.

126.     Strathmore's violations of G.L. c. 176D, §3(9) constitute unfair or deceptive acts or practices in violation of G.L. c. 93A, §2.

127.     Strathmore's conduct as alleged herein constitutes unfair or deceptive acts or practices in violation of G.L. c. 93A, §2.

128.     Strathmore's conduct regarding Select Hospitality and the Massachusetts Subclasses has occurred primarily and substantially within the Commonwealth.

129.     Strathmore's violations of G.L. c. 176D, §3(9) and G.L. c. 93A were willful and knowing.

130.     Strathmore's violations of G.L. c. 176D, §3(9) and G.L. c. 93A have directly and proximately caused Select Hospitality and the Massachusetts Subclasses substantial harm.

131.     Strathmore is liable to Select Hospitality and the Massachusetts Subclasses, pursuant to G.L. c. 93A, §11, for damages sustained by Select Hospitality and the Massachusetts Subclasses due to Strathmore's violations of G.L. c. 176D, §3(9) and G.L. c. 93A, §2.

132.     Strathmore is liable to Select Hospitality and the Massachusetts Subclasses, pursuant to M.G.L. c. 93A, §11, for up to three times the damages sustained by Select Hospitality and the Massachusetts Subclasses, in amounts to be proven at trial, in light of Strathmore's knowing and willful violations of G.L. c. 176D, §3(9)  and G.L. c. 93A, §2.

## REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in its favor and against Strathmore as follows:

a.      Certifying the Classes pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and/or 23(c)(4), and appointing Select Hospitality as class representative for the Classes;

b.      Finding that Strathmore has breached the Strathmore insurance policies by failing to pay Select Hospitality and the Classes' business interruption losses and extra expense claims;

c.      Declaring that Select Hospitality and the members of the Classes are entitled to coverage under their Strathmore insurance policies and that no exclusions under the policies limit or bar coverage;

d.      Finding with respect to Select Hospitality and the Massachusetts Subclasses that Strathmore has violated G.L. c. 176D, §3(9) and G.L. c. 93A, §§ 2, 11, in connection with its unfair or deceptive acts or practices alleged herein;

e.      For Select Hospitality and the Classes, an award of general and compensatory damages, restitution, and disgorgement, in an amount to be determined at trial;

f.   For Select Hospitality and the Massachusetts Subclasses, an award of up to three times Select Hospitality's and the members of the Massachusetts Subclasses' damages under G.L. c. 93A, §11;

g.   For costs of suit;

h.   For reasonable attorney's fees and expenses incurred in this action pursuant to statute or as otherwise recoverable;

i.   For an award of pre-judgment and post-judgment interest; and

j.   For such other relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

By its attorneys,

*/s/ Michelle H. Blauner*
Edward F. Haber (BBO #215620)
Michelle H. Blauner (BBO #549049)
Ian J. McLoughlin (BBO #647203)
Adam M. Stewart (BBO #661090)
Patrick J. Vallely (BBO #663866)
SHAPIRO HABER & URMY LLP
2 Seaport Lane
Boston, MA 02210
Telephone: (617) 439-3939
Facsimile: (617) 439-0134
ehaber@shulaw.com
mblauner@shulaw.com
imcloughlin@shulaw.com
astewart@shulaw.com
pvallely@shulaw.com

*Counsel for Plaintiff and the Classes*